# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHELSEA HENKEL, LISA HASTINGS, LEONORA MOCERINO, CRAIG MOCERINO, and LIZETH LARKIN, on behalf of themselves and others similarly situated, : : : : : : : | CIVIL ACTION<br><br>Case No.: 3:15-cv-01435-RDM<br>(Honorable Robert D. Mariani) |
| Plaintiffs, : :<br>v. : : | *Document Filed Electronically* |
| HIGHGATE HOTELS, L.P., and COVE HAVEN, INC., : : : : | |
| Defendants. : : | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

Dated: June 14, 2019

David B. Feldman
Evan B. Citron
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C
599 Lexington Avenue, 17th Floor
New York, NY 10022
(212) 492-2500

*Attorneys for Defendants*
*Highgate Hotels, L.P. and Cove Haven, Inc.*

# **TABLE OF CONTENTS**

**Page(s)**

I.      PRELIMINARY STATEMENT ............................................................... 1

II.     FACTUAL BACKGROUND ................................................................... 2

      A.      STARWOOD'S MANAGEMENT OF THE RESORTS ............. 2

      B.      HIGHGATE'S MANAGEMENT OF THE RESORTS ............... 3

III.    PROCEDURAL HISTORY ..................................................................... 9

IV.     QUESTIONS PRESENTED ..................................................................... 9

V.      ARGUMENT .......................................................................................... 10

      A.      STANDARD OF REVIEW ........................................................ 10

      B.      PLAINTIFFS' CLAIMS FOR MINIMUM WAGE
             VIOLATIONS SHOULD BE DISMISSED ............................... 11

      C.      PLAINTIFFS' CLAIMS FOR BREACH OF CONTRACT
             AS EXPRESS OR INTENDED THIRD-PARTY
             BENEFICIARIES SHOULD BE DISMISSED .......................... 12

            1.     Plaintiffs Are Not Express Third-Party Beneficiaries of
                 Defendants' Contracts With Their Customers .................. 12

            2.     Plaintiffs Are Not Intended Third-Party Beneficiaries
                 of Defendants' Contracts With Their Customers .............. 13

      D.      THE COURT SHOULD DISMISS PLAINTIFFS' UNJUST
             ENRICHMENT CLAIMS ........................................................... 17

      E.      THE COURT SHOULD DISMISS PLAINTIFFS'
             CONVERSION CLAIMS ........................................................... 19

VI.     CONCLUSION ....................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Bank & Trust Co. v. Lied*,
  409 A.2d 377 (1979) ...........................................................................................15

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).............................................................................................11

*Ankerstjerne v. Schlumberger, Ltd.*,
  155 F. App'x 48 (3d Cir. 2005) ..........................................................................19

*Bair v. Purcell*,
  500 F. Supp. 2d 468 (M.D. Pa. 2007).............................................................17, 18

*Carstetter v. Adams County Transit Auth.*,
  2008 WL 2704600 (M.D. Pa. Feb. 14, 2008)
  *report and recommendation adopted in part, rejected in part*,
  2008 WL 2704596 (M.D. Pa. July 8, 2008) ......................................................14

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................................................11

*Diodato v. Wells Fargo Ins. Services, USA, Inc.*,
  44 F. Supp. 3d 541 (M.D. Pa. 2014)..................................................................18

*Duane Morris, LLP v. Todi*,
  2002 WL 31053839 (Pa. Ct. Com. Pl. Sept. 3, 2002) .......................................19

*Holland v. Levy Premium Foodservice Ltd. P'ship*,
  2011 WL 13187055 (N.D. Ga. 2011) ................................................................20

*Kia v. Imaging Sciences Int'l, Inc.*,
  735 F.Supp.2d 256 (E.D. Pa. 2010)...................................................................19

*Livi v. Hyatt Hotels Corp.*,
  751 F. App'x 208 (3d Cir. 2018) .................................................................16, 20

*M.S. v. Cedar Bridge Military Acad.*,
  904 F. Supp.2d 399 (M.D. Pa. 2012).........................................................*passim*

*McGoldrick v. TruePosition, Inc.*,
    623 F. Supp. 2d 619 (E.D. Pa. 2009) ...........................................................17, 18

*Mechmet v. Four Seasons Hotels, Ltd.*,
    825 F.2d 1173 (7th Cir. 1987) ...............................................................................16

*Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Inv.*,
    951 F.2d 1399 (3d Cir. 1991) .........................................................................13, 15

*Otobai, Inc. v. Auto Tell Servs., Inc.*,
    1994 WL 249766 (E.D. Pa. June 1, 1994) ............................................................15

*Schoch v. First Fidelity Bancorporation*,
    912 F.2d 654 (3d Cir. 1990) ..................................................................................11

*Sovereign Bank v. BJ's Wholesale Club, Inc.*,
    395 F. Supp.2d 183 (M.D. Pa. 2005)......................................................................13

*Taylor v. Pathmark Inc.*,
    2013 WL 943359 (E.D. Pa. Mar. 12, 2013) ........................................................12

*Universal Premium Acceptance Corp. v. York Bank & Trust Co.*,
    69 F.3d 695 (3d Cir. 1995) ....................................................................................19

*Verma v. 3001 Castor, Inc.*,
    2016 WL 6962522 (E.D. Pa. Nov. 29, 2016) .......................................................16

## Other Authorities

Fed. R. Civ. P. 56(a).................................................................................................10

Defendants Highgate Hotels, L.P. ("Highgate") and Cove Haven, Inc. ("Cove Haven") (collectively, "Defendants") submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 56, for partial summary judgment seeking the dismissal of the claims filed by Plaintiffs Chelsea Henkel ("Henkel"), Lisa Hastings ("Hastings"), Leonora Mocerino, Craig Mocerino (together, the "Mocerinos"), and Lizeth Larkin ("Larkin") (collectively, "Plaintiffs") for (i) unpaid minimum wages in violation of the Fair Labor Standards Act (the "FLSA") and the Pennsylvania Minimum Wage Act (the "MWA"); (ii) breach of contract to an express or intended third-party beneficiary; (iii) unjust enrichment; and (iv) conversion.

## I.   PRELIMINARY STATEMENT

Plaintiffs' claims to which Defendants' motion is directed are incapable of surviving summary judgment.   First, Plaintiffs' claims for minimum wage violations under the FLSA and MWA fail because Highgate ensured that all of its employees, including Plaintiffs, were paid at least the applicable state and federal minimum wage.   Plaintiffs' breach of contract, unjust enrichment, and conversion claims – premised on Defendants' failure to distribute customers' payment of the mandatory charge identified as "gratuity" to service employees at Defendants' all-inclusive resorts – are equally meritless.

Plaintiff's third-party breach of contract claims fail because Plaintiffs have no standing as third-party beneficiaries to Defendants' contracts with their

1

customers.    Plaintiffs' unjust enrichment claims fail because they have not

conferred any benefit upon Defendants for which Defendants were unjustly

enriched.   Nor can Plaintiffs establish that it would be unjust for Defendants to

retain the benefits of Plaintiffs' services without further compensation.   Plaintiffs'

conversion claims fail because Plaintiffs never had any property interest in the

money that was allegedly converted by Defendants, the Gratuity.   Indeed, Plaintiffs

never owned or possessed the Gratuity, nor had any right to, as it was not a tip

under applicable state or federal law.

## II.    <u>FACTUAL BACKGROUND</u>

## A.    <u>STARWOOD'S MANAGEMENT OF THE RESORTS</u>

Cove Haven, Paradise Stream, and Pocono Palace (collectively, the

"Resorts") are all-inclusive properties, where, in return for paying the charges and

fees for the Resorts' all-inclusive package, guests receive lodging, meals, and

access to various amenities, activities, and entertainment offerings.   (Defendants'

Local Civil Rule 56.1 Statement ("Defs. 56.1"), ¶ 1.)   The all-inclusive model of

resort is so designed so that, upon paying the cost of an all-inclusive package,

guests need not concern themselves with continually paying for services – like

food, amenities, and entertainment – as separate items during their stay.   (*Id.*, ¶ 2.)

In 1995, ITT purchased the Resorts from Caesar's World ("Caesar's"),

which had owned and managed them since at least 1979.   (*Id.*, ¶ 3.)   In 1998,

Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") purchased the Resorts from ITT, and commenced managing them.  (*Id.*, ¶ 4.)

Starwood's management of the Resorts entailed, *inter alia*, setting the charges and fees for the all-inclusive package that accompanied a room reservation at the Resorts.  (*Id.*, ¶ 5.)  In so doing, Starwood continued Caesar's long-standing practice of including a mandatory charge identified as "gratuity" (the "Gratuity") as part of the cost of the all-inclusive package offered by the Resorts.  (*Id.*)  The cost of the Resorts' all-inclusive package thus consisted of (i) the rate of a room reservation, (ii) the Gratuity, and (iii) applicable taxes.  (*Id.*, ¶ 6.)  The Gratuity was never intended to be distributed to any Resort employees as a tip, and was never distributed as such.  (*Id.*, ¶ 7.)  Instead, it was allocated internally as revenue, and used to fund, *inter alia*, wages and the upkeep of amenities.  (*Id.*)

Starwood neither trained nor instructed employees that the Gratuity was tip money for any Resort employees (*Id.*, ¶ 8.)  Resort guests rarely asked front desk personnel about the Gratuity, and reservationists fielded general questions about its purpose on approximately 10% of calls from prospective customers.  (*Id.*, ¶ 9.)

## B.   <u>HIGHGATE'S MANAGEMENT OF THE RESORTS</u>

In October 2012, Rockpoint and Highgate purchased the Resorts from Starwood, and Highgate commenced sole and exclusive management of them (*Id.*,

¶ 10.)  In assuming management responsibility for the Resorts, Highgate succeeded Starwood as the employer of the Resorts' employees.  (*Id.*, ¶ 11.)

Highgate's management of the all-inclusive Resorts marked a departure from its historical practice of managing standalone hotels. (*Id.*, ¶ 12.)  Highgate recognized that its entrance into a new market entailed a "learning process," and thus opted to continue the policies and practices that Starwood – and the Resorts' employees – had observed during Starwood's 14-year period of management.  (*Id.*, ¶ 13.)  Accordingly, Highgate continued Starwood's practices with respect to the charges and fees for the Resorts' all-inclusive packages, and thus maintained, *inter alia*, the Gratuity as part of the total package cost.  (*Id.*, ¶ 14.)  Highgate thus contracted with guests to provide the Resorts' all-inclusive packages in exchange for the total package cost, including the Gratuity.  (*Id.*, ¶ 15.)  Highgate's contracts with its guests <u>never</u> (i) identified the Gratuity as a tip for its employees; (ii) provided for the Gratuity to be distributed as a tip to its employees; or (iii) reflected any intent for the Gratuity to constitute a tip to be distributed to its employees.  (*Id.*)

Like Starwood, neither trained nor instructed employees that the Gratuity was tip money for any Resort employees.  (*Id.*, ¶ 16.)[1]  As was the case during

---

[1] On May 8, 2019, Plaintiffs presented, for the first time, a document entitled "Contact Center Agent Training Guide," purportedly in support of their claims.

4

Starwood's management, Resort guests rarely asked front desk personnel or reservationists about the Gratuity. (*Id.*, ¶ 17.) As with Starwood, Highgate also continued to allocate the Gratuity as revenue, and used it to fund, *inter alia*, wages and the upkeep of amenities. (*Id.*, ¶ 18.)

Highgate's managerial, financial, operational, human resources, and marketing officers who worked at or in connection with the Resorts – whether based at the Resorts or elsewhere – understood that the Gratuity was never intended to be distributed to any Resort employees as a tip, was never distributed to any Resort employees as a tip, and was never planned or intended to be explained as a tip to guests. (*Id.*, ¶ 19.) For example:

- Tom Poehailos, Highgate's Senior Vice President of Operations, attests that (i) Highgate used the Gratuity to pay wages and for the upkeep of amenities; (ii) the Gratuity permitted Highgate to ensure higher wage rates for its employees; (iii) Highgate would never instruct an employee to provide a customer with misinformation, or condone an employee's doing so; (iv) Highgate did not instruct any Resort employee to tell customers that the Gratuity was distributed directly to employees as tips, and would never condone an employee's doing so; and (iv) any representation of a Highgate employee to a customer that the Gratuity was distributed to employees as tips was the result of that employee being misinformed, not an intent to deceive. (*Id.*, ¶ 20.)

- James McGrath, Highgate's Regional Vice President of Operations responsible for the Resorts, testified that (i) the Gratuity was a "service

---

(*Id.*, ¶ 16 n.2.) However, as will be established herein, the evidence (documentary and testimonial) and the controlling statutory and case law support and justify the granting of Defendants' motion for partial summary judgment.

charge" that was classified as "miscellaneous revenue," which is revenue that funds "maintenance, amenities, [and] payroll"; and (ii) it would be "very surprising" to him if an employee had told a guest that the Gratuity was to cover tips for waiters and waitresses, and that any such employee "didn't know what they were talking about."  (*Id.*, ¶ 21.)

- Donald Sheneman, Area Director of Operations of the Resorts, testified that (i) he was unaware of anyone having informed guests that the Gratuity was distributed to certain employees so that guests would not have to tip those employees while at the Resorts; (ii) the Gratuity was not distributed directly to employees, and was used to finance amenities; (iii) tips were never part of the all-inclusive package at the Resorts, and the Resorts "never used" the term "tips" in describing the package.  (*Id.*, ¶ 22.)

- Peter Doggett, the General Manager of Cove Haven, testified that the Gratuity "was designed to basically provid[e] funding or additional revenues for payroll for all employees."  (*Id.*, ¶ 23.)

- Maura Roman, Director of Marketing and Sales at the Resorts, testified that (i) Highgate used the Gratuity to finance all of the services the guest receives from an all-inclusive resort, including lodging, amenities, entertainment, activities, and food; (ii) Highgate did not inform guests that "tips were included" in the all-inclusive package; and (iii) the Gratuity was a "service charge."  (*Id.*, ¶ 24.)

- Julia Perry, a Reservations Manager, testified that (i) employees called the Gratuity a "service charge" that financed "all the services that were provided to [guests] while on the property"; and (ii) if asked by a guest "where the [Gratuity] goes," she would "tell them that [the Gratuity] was part of their package price," and that "[i]t didn't go to anybody."  (*Id.*, ¶ 25.)

- Peggy Marshall, Director of Finance at the Resorts for more than 20 years, testified that (i) the Gratuity was a "service charge" allocated as revenue; (ii) she would have been "surprised" to hear that an employee told a guest that the Gratuity was distributed to restaurant servers as tips because it was not.  (*Id.*, ¶ 26.)

- Judy Starner, also Director of Finance at the Resorts for more than 20 years, testified that (i) the Gratuity was a "service charge" that was used

for the amenities; and (ii) it would not be referred to as a "tip." (*Id.*, ¶ 27.)

Highgate's dealings and contractual with Groupon, Inc. ("Groupon") – through which the Resorts received a significant portion of their business – further reflect its understanding that the Gratuity was a service charge. Beginning in or around 2012, the Resorts and Groupon, Inc. ("Groupon") entered into Room Reservation Deal Requests, agreements through which Groupon agreed to provide online marketing, promotional, and room reservation services. (*Id.*, ¶ 28.) Each agreement contained a section entitled "Fine Print," which set forth Highgate's applicable policies and details pertaining to the offer, which Groupon then would recite in the offer to potential purchasers. (*Id.*)

When the Resorts first entered into this arrangement with Groupon, the agreements provided that guests would be charged a mandatory "18% Gratuity," which was the standard fee charged by Highgate at that time. (*Id.*, ¶ 29.) In 2014, the Resorts introduced a "room only" option, which differed from the "all inclusive" package only insofar as it did not include meals. (*Id.*) For a period of time in 2014, the "room only" option through Groupon did not include a mandatory service charge. (*Id.*) However, given that the "room only" guests had access to the same amenities and services on the Resort property as those who had purchased the "all inclusive" package, including such recreational activities as boating, volleyball, basketball, archery, and tennis, Highgate management decided

7

that the "room only" option also must include a mandatory service fee going forward.  (*Id.*)  By October 2014, in connection with any offers through Groupon, the Resorts ceased referring to the mandatory service charge as a "Gratuity" and instead instructed Groupon that the offers must disclose that guests would be charged a fixed percentage identified as a "Service Fee."  (*Id.*)

While the Gratuity was never intended to be a tip for Resort employees and never distributed as such, certain front desk employees and reservationists mistakenly believed that the Gratuity was distributed directly to certain service employees as tips, and told guests the same.  (*Id.*, ¶ 30.)  These employees acknowledge that Highgate never represented to them that the Gratuity was distributed that way, nor trained or instructed them to tell guests that it was. (*Id.*, ¶ 31.)  Any representation of a Highgate employee to a customer that the Gratuity was distributed to employees as tips was the result of that employee being misinformed, not an intent to deceive.  (*Id.*, ¶ 32.)

In December 2015, The Packard Companies purchased the Resorts, and Highgate ceased managing them at that time. (*Id.*, ¶ 33.)  During its period of management, Highgate ensured that its employees, including its servers, like Plaintiffs, received at least $7.25 per hour, the applicable state and federal minimum wage. (*Id.*, 34.)

### III.   **PROCEDURAL HISTORY**

On July 23, 2015, Henkel filed the Complaint.  (Docket No. 1.)  On October 12, 2015, three additional plaintiffs – Hastings and the Mocerinos – joined Henkel in filing the First Amended Complaint.  (Docket No. 12.)  On November 30, 2015, Defendants filed a Motion to Dismiss the FAC (the "Motion").  (Docket No. 16.)  On August 31, 2016, Magistrate Judge Carlson issued a Report and Recommendation that recommended that the Court grant the Motion and dismiss the FAC without prejudice (the "August 31 Report").  (Docket No. 44.)  On September 20, 2016, the Court adopted the August 31 Report and dismissed the FAC without prejudice.  (Docket No. 46.)  On October 11, 2016, Plaintiffs filed their Second Amended Complaint.  (Docket No. 47.)  On October 24, 2016, Plaintiffs filed their Third Amended Complaint (the "TAC").  (Docket No. 49.)  On December 22, 2016, Defendants filed their Answer to the TAC.  (Docket No. 53.)  On November 14, 2018, Plaintiffs filed their Fourth Amended Complaint.  (Docket No. 110.)  On November 29, 2018, Defendants filed their Answer to that pleading.  (Docket No. 111.)

### IV.   **QUESTIONS PRESENTED**

1.    Should the Court dismiss Plaintiffs' claims for minimum wage violations of the FLSA and MWA where Defendants always compensated Plaintiffs at a rate at or greater than the applicable minimum wage?

*Recommended Answer:  Yes*

2.      Should the Court dismiss Plaintiffs' claims for breach of contract to an express or intended third-party beneficiary where Plaintiffs have no standing as third-party beneficiaries to Defendants' contracts with their customers?

*Recommended Answer:  Yes*

3.      Should the Court dismiss Plaintiffs' claims for unjust enrichment because Plaintiffs conferred no benefit upon Defendants that Defendants unjustly kept?

*Recommended Answer:  Yes*

4.      Should the Court dismiss Plaintiffs' claims for conversion because Plaintiffs never had any property interest in the money that was allegedly converted by Defendants (*i.e.*, the Gratuity)?

*Recommended Answer:  Yes*

## V.      **ARGUMENT**

## A.      **STANDARD OF REVIEW**

A party is entitled to summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In this context, "materiality" is determined by the applicable substantive law; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once a moving party demonstrates a lack of evidence to support the non-moving party's claims, the non-moving party must present competent evidence of a genuine issue for trial. *Id.* at 324. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported application; the dispute must concern a material fact. *Anderson*, 744 U.S. at 247-48. Thus, to survive Defendants' application, Plaintiffs must produce specific admissible evidence to support each element of their claims. *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990). Plaintiffs' inability to do so here necessitates the dismissal of their action.

**B.   PLAINTIFFS' CLAIMS FOR MINIMUM
WAGE VIOLATIONS SHOULD BE DISMISSED**

Plaintiffs' minimum wage claims under the FLSA and MWA fail because Highgate ensured that its employees, including Plaintiffs, received at least $7.25 per hour during the relevant period. (*See* Defs. 56.1, ¶ 34.) Plaintiffs cannot cite any evidence to the contrary. Accordingly, these claims should be dismissed.

**C.   PLAINTIFFS' CLAIMS FOR BREACH OF CONTRACT
AS EXPRESS OR INTENDED THIRD-PARTY
<u>BENEFICIARIES SHOULD BE DISMISSED</u>**

Plaintiffs' third-party beneficiary contract claims fail because Plaintiffs were neither express nor intended third-party beneficiaries of Defendants' contracts with their customers.

### 1.   Plaintiffs Are Not Express Third-Party Beneficiaries <u>of Defendants' Contracts With Their Customers</u>

Third-party beneficiary status, "subject to limited exception, will be recognized only where the obligation to the third party 'affirmatively appear[s] in the contract itself.'" *Taylor v. Pathmark Inc.*, 2013 WL 943359, at *6 (E.D. Pa. Mar. 12, 2013) (quoting *Sound of Market Street, Inc. v. Continental Bank International*, 819 F.2d 384, 389 (3d Cir. 1987)).   The test for express third-party beneficiary status "requires that the parties to the agreement indicate in the agreement itself that the purported beneficiary is a third-party beneficiary." *See M.S. v. Cedar Bridge Military Acad.*, 904 F. Supp.2d 399, 412 (M.D. Pa. 2012). Plaintiffs fail that test here, as they do not and cannot show that they – or any of Defendants' employees – affirmatively appeared in any provision of Defendants' contracts with their customers, let alone were identified as third-party beneficiaries therein.   That certain front desk employees and reservationists mistakenly believed that the Gratuity was distributed directly to certain service employees as tips, and told guests the same (Mosher Dep. at 43:19 – 43:22; Docket Nos. 98-100), is of no

consequence, as Pennsylvania law makes plain that (i) an express third-party beneficiary must be identified as such "in the agreement itself" (*M.S.*, 904 F. Supp.2d at 412); and (ii) such oral statements cannot create contractual obligations beyond Defendants' contracts with their customers.  *See, e.g.*, *Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Inv.*, 951 F.2d 1399, 1405 (3d Cir. 1991).

## 2.    **Plaintiffs Are Not Intended Third-Party Beneficiaries of Defendants' Contracts With Their Customers**

To qualify as intended third-party beneficiaries, Plaintiffs must satisfy a two-part test.  "First, the circumstances must be so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties."  *M.S.*, 904 F. Supp.2d at 412.  "Second, it must be shown either that the performance satisfies an obligation [of the party against whom enforcement is sought] to pay money to the beneficiary or that the circumstances indicate that the [party] intends to give the beneficiary the benefit of the promised performance."  *Id.*  The Supreme Court of Pennsylvania has explained the test as follows:

> The first part of the test sets forth a standing requirement which leaves discretion with the court to determine whether recognition of third party beneficiary status would be appropriate.  The second part defines the two types of claimants who may be intended as third party beneficiaries.  If a party satisfies both parts of the test, a claim may be asserted under the contract.

*Sovereign Bank v. BJ's Wholesale Club, Inc.*, 395 F. Supp.2d 183, 199 (M.D. Pa.

2005) (quoting *Scarpitti v. Weborg*, 530 Pa. 366, 371 (1992)).

Plaintiffs are utterly incapable of satisfying either element of the test here. As an initial matter, Defendants' contracts with their customers do not remotely present circumstances "so compelling that recognition of [Plaintiffs'] right is appropriate to effectuate the intention of [Defendants and their customers]." *M.S.*, 904 F. Supp.2d at 412. The purpose of those contracts was for Defendants' customers to provide Defendants with money in exchange for the all-inclusive package. Nothing expressed in those contracts – including the mere use of the word "gratuity" – indicates an intent by Defendants or their customers to benefit Plaintiffs, nor are there any other circumstances that indicate such an intent. *See Carstetter v. Adams County Transit Auth.*, 2008 WL 2704600, at *12 (M.D. Pa. Feb. 14, 2008) ("These [contract] provisions . . . do not indicate an intent to benefit the plaintiff or employees in general. Rather, these provisions merely set forth the services that [one party to the contract] agreed to provide [defendant] for the benefit of [defendant.]"), *report and recommendation adopted in part, rejected in part*, 2008 WL 2704596 (M.D. Pa. July 8, 2008). Plaintiffs' inability to establish that the direct and primary purpose of Defendants' contracts with their customers was to bestow a benefit upon Plaintiffs dooms their intended third-party beneficiary claims here.

That certain front desk employees and reservationists mistakenly believed that the Gratuity was distributed directly to certain service employees as tips, and told guests the same is inconsequential.   First, Plaintiffs cannot furnish any evidence to suggest that Defendants promised and reached a contractual agreement with their customers to pay the Gratuity to Plaintiffs.   The record evidence, in contrast, makes plain that Defendants never intended to distribute the Gratuity as tips to Plaintiffs.   (*See supra* Section II.B.)

In addition, as noted *supra*, the parol evidence rule bars such comments from modifying Defendants' contracts with their customers.   *See, e.g.*, *Mellon Bank*, 951 F.2d at 1405; *Am. Bank & Trust Co. v. Lied*, 409 A.2d 377, 381 (1979) (parol evidence will not be considered "for the purpose of varying or contradicting the terms of a contract which both parties intended to represent the definite and complete statement of their agreement").   Indeed, if Defendants were contractually required to provide the Gratuity to their employees, such a requirement would have been in the written contract, itself, and not stated to customers orally on an *ad hoc* basis.   *Otobai, Inc. v. Auto Tell Servs., Inc.*, 1994 WL 249766, at *4 (E.D. Pa. June 1, 1994) ("When a contractual obligation is conditional, one would normally expect that condition to be stated in the body of the contract.").

Even if Plaintiffs were able to satisfy the first, "standing requirement" part the test, they cannot satisfy the second.   *See M.S.*, 904 F. Supp.2d at 412.   Nothing

in Defendants' contracts with their customers suggests, let alone establishes, an obligation on Defendants' part to distribute the Gratuity as tips to Plaintiffs. Nor is there any legal basis for such an obligation, as a mandatory charge for service, like the Gratuity, is not a tip under applicable state or federal law. *See Livi v. Hyatt Hotels Corp.*, 751 F. App'x 208, 212 n.8 (3d Cir. 2018) (Pennsylvania law provides that, tips, in contrast to compulsory service charges, are "voluntary, monetary contributions received by an employee from a guest, patron or customer for services rendered"); *Verma v. 3001 Castor, Inc.*, 2016 WL 6962522, at *6 (E.D. Pa. Nov. 29, 2016) (DOL regulations provide that a "compulsory charge for service . . . imposed on the customer by an employer's establishment" is a service charge, not a tip); *see also Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1177 (7th Cir. 1987) (hotel's description of a mandatory charge as a "gratuity" should be afforded "no weight" in assessing whether the charge was a tip for servers where the charge functioned as a service charge). Nor is there any indication that Defendants intended to give Plaintiffs the benefit of the promised performance – the Gratuity – as that charge, along with the room reservation cost and other applicable fees, was provided to Defendants by Resort customers in exchange for the all-inclusive package. *See, e.g.*, *M.S.*, 904 F. Supp. 2d at 412.

16

**D.    THE COURT SHOULD DISMISS**
<u>**PLAINTIFFS' UNJUST ENRICHMENT CLAIMS**</u>

To sustain their unjust enrichment claims, Plaintiffs must establish: (1) that they conferred benefits upon Defendants by Plaintiffs; (2) appreciation of such benefits by Defendants; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for Defendants to retain the benefit without payment of value. *See McGoldrick v. TruePosition, Inc.*, 623 F. Supp. 2d 619, 624 (E.D. Pa. 2009) (citing *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. Ct. 2001)). Plaintiffs must demonstrate that "the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider" of the benefit." *Bair v. Purcell*, 500 F. Supp. 2d 468, 495 (M.D. Pa. 2007). Plaintiffs cannot make the evidentiary showing necessary to save their claims.

First, Plaintiffs claims fail because they have not conferred any benefit upon Defendants for which Defendants were unjustly enriched. The benefit upon which Plaintiffs' claims are premised – the Gratuity – was conferred upon Defendants by Defendants' customers, not Plaintiffs. And, in any event, the Gratuity, along with the room reservation cost and other applicable fees, was paid to Defendants for value given – the all-inclusive package. As Plaintiffs were not the "provider" of

the benefit at issue (the Gratuity), they cannot maintain any claim that Defendants were unjustly enriched by receiving it. *See Bair v. Purcell*, 500 F. Supp. 2d at 495.

Notwithstanding that fatal deficiency, Plaintiffs' claims fail because they cannot establish that it would be unjust or unconscionable for Defendants to retain the benefits of Plaintiffs' services without further compensation. Defendants never agreed or promised to pay Plaintiffs the Gratuity, and Plaintiffs' performance of their job duties for agreed-upon compensation cannot give rise to an unjust enrichment claim. *See McGoldrick*, 623 F. Supp. 2d at 625 ("this Court fails to see how [plaintiff's] performance of his job has unjustly enriched [defendant. Plaintiff] performed his job and was compensated with his salary.") Indeed, "courts routinely reject unjust enrichment claims when a plaintiff is hired for a particular purpose, accomplishes that purpose, and is compensated for those services." *Diodato v. Wells Fargo Ins. Services, USA, Inc.*, 44 F. Supp. 3d 541, 565 (M.D. Pa. 2014). Plaintiffs' apparent belief that they should have received additional compensation for their services rendered does not create an unjust enrichment claim. *See Bair*, 500 F. Supp. 2d at 495 (dismissing unjust enrichment claim because "Plaintiffs concede that they were paid a salary…[and] earned commissions and travel funds above…base pay. Although Plaintiffs now argue that these agreed upon salaries did not adequately compensate them for the value of their experience, Plaintiffs nevertheless were both paid salaries for the work

they performed."); *Ankerstjerne v. Schlumberger, Ltd.*, 155 F. App'x 48, 52 (3d Cir. 2005) (affirming summary judgment in favor of employer on unjust enrichment claim because "[t]he plaintiff [had] not shown that he provided the defendants with anything more than the work he was hired to do").

### E.   THE COURT SHOULD DISMISS PLAINTIFFS' CONVERSION CLAIMS

Under Pennsylvania law, "conversion is the deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir. 1995). "Money may be the subject of a conversion," but "only where the plaintiff had a property interest in the money at the time of the alleged conversion." *Kia v. Imaging Sciences Int'l, Inc.*, 735 F.Supp.2d 256, 270 (E.D. Pa. 2010). Furthermore, "[t]he rights to this money must have belonged originally to the plaintiff rather than acquired through a contract." *Duane Morris, LLP v. Todi*, 2002 WL 31053839, at *5 (Pa. Ct. Com. Pl. Sept. 3, 2002).

Plaintiffs' conversion claims fail because they never had any property interest in the money that was allegedly converted by Defendants (*i.e.*, the Gratuity). Plaintiffs never owned or possessed the Gratuity, which was paid by Defendants' customers along with other monies to Defendants in exchange for the all-inclusive package. Nor did Plaintiffs have any right to possess the Gratuity,

which, as noted *supra*, was not a tip under applicable state or federal law.  *See Livi*, 751 F. App'x at 212 n.8.

*Holland v. Levy Premium Foodservice Limited Partnership*, 2011 WL 13187055 (N.D. Ga. 2011), is particularly instructive.  In *Holland*, the defendants imposed a service charge on all food and beverages purchased by their customers. *Id.* at *1.  The plaintiff food and beverage servers asserted conversion claims against defendants for retaining the service charge instead of paying it to plaintiffs. *Id.*  In dismissing the plaintiffs' conversion claims, the court noted:

> The plaintiffs have failed to allege their ownership or right to possess the service charge monies. The plaintiffs simply alleged that the service charge was intended by [the customers] to be paid to the plaintiffs.  This allegation is insufficient to establish any entitlement to the funds by the plaintiffs. Moreover, because the breach of contract claims are not viable, the amended complaint contains no legal theory of ownership or right to the funds by the plaintiffs.

*Id.* at *3.  Like the plaintiffs in *Holland*, Plaintiffs have no ownership or right to the Gratuity.  While *Holland* is not binding on this court, it is well-reasoned and reflects considered analysis of a common law conversion claim that is directly analogous to Plaintiffs' here.

## VI.   CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Court should grant partial summary judgment in favor of Defendants.

Dated:  June 14, 2019                    Respectfully submitted,

                                         */s/ David B. Feldman*
                                         David B. Feldman, Admitted *Pro Hac Vice*
                                         Evan B. Citron, Admitted *Pro Hac Vice*
                                         OGLETREE, DEAKINS, NASH,
                                           SMOAK & STEWART, P.C.
                                         599 Lexington Avenue, 17th Floor
                                         New York, NY 10022
                                         (212) 492-2500 (phone)
                                         (212) 492-2501 (fax)
                                         david.feldman@ogletree.com
                                         evan.citron@ogletree.com

                                         *Attorneys for Defendants*
                                         *Highgate Hotels, L.P. and Cove Haven, Inc.*

## **CERTIFICATE OF WORD COUNT**

I hereby certify that, as required by LR 7.8, Defendants' Memorandum of Law In Support of Their Motion for Partial Summary Judgment does not exceed 5,000 words.  Rather, the word count, exclusive of the caption, tables of contents and authorities, certificates of compliance and service, and signature block, is 4695 words per the word count feature of the word-processing system used to prepare brief.

Dated:  June 14, 2019

_/s/ David B. Feldman_
David B. Feldman
Attorney for Defendants
