**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHELSEA HENKEL, *et al.*, on behalf of themselves and others similarly situated, | : : : | Civil No. 3:15-CV-01435 |
| Plaintiff, | : : | |
| v. | : : | |
| HIGHGATE HOTELS, LP, *et al.*, | : : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Before the court is Defendants' motion for partial summary judgment, wherein Defendants argue that judgment should be entered in their favor on Counts 1, 3, and 5 through 8 of Plaintiffs' fourth amended complaint.  (Doc. 139.)  The court finds that there are material issues of fact regarding "the gratuity" at issue in this case that must be decided by a jury, thus constraining the court to resolve only five of Plaintiffs' claims by means of summary judgment.  For the reasons that follow, the court will grant Defendants' motion as to Counts 1, 3, 5, 6, and 8, but deny the motion as to Count 7.

### PROCEDURAL HISTORY

Plaintiff, Chelsea Henkel ("Henkel"), initiated this action via a collective and class action complaint on July 23, 2015, against Defendants Highgate Hotels, LP ("Highgate") and Cove Haven, Inc. ("Cove Haven") (collectively, "Defendants").  (Doc. 1.)  Henkel amended her complaint as of right on October 2,

2015, and Defendants responded by filing a motion to dismiss.  (Docs. 12, 16.)

Once ripe, the court granted Defendants' motion to dismiss on November 20, 2016,

and permitted Henkel to file an amended complaint.  (Doc. 46.)  Shortly after

Henkel filed a second amended complaint, the parties stipulated to permit Henkel

to file a third amended complaint.  (Docs. 47, 48, 50.)  Henkel filed her third

amended complaint on October 24, 2016.  (Doc. 49.)

By September 7, 2017, over thirty other individuals had opted-in as

Plaintiffs in this case.  (*See* Docs. 56, 57, 60, 64.)  On October 4, 2017, Plaintiffs

moved to amend or correct their complaint, and on December 7, 2017, they filed a

motion to certify class and conditionally certify a collective.  (Docs. 66, 77.)

Following multiple requests for extension of discovery and to file briefs, the court

granted Plaintiffs' motion to amend or correct her complaint and Plaintiffs filed

their fourth amended complaint on November 14, 2018.  (Docs. 108, 109, 110.)

In the fourth amended complaint, which is the operative complaint, Plaintiffs

set forth eight claims against Defendants: unpaid minimum wages in violation of

the Fair Labor Standards Act ("FLSA") (Count 1);  unpaid overtime wages in

violation of the FLSA (Count 2); unpaid minimum wages in violation of the

Pennsylvania Minimum Wage Act ("MWA") (Count 3); unpaid overtime wages in

violation of the MWA (Count 4); breach of contract to an express third-party

beneficiary (Count 5); breach of contract to an intended third-party beneficiary

(Count 6); unjust enrichment (Count 7); and conversion (Count 8).  (Doc. 110.)
Defendants answered the fourth amended complaint on November 29, 2018.  (Doc. 111.)

Thereafter, the parties requested another extension of time to complete discovery and for Defendants to respond to Plaintiffs' motion for conditional class and collective certification.  (Doc. 115.)  On February 21, 2019, the court, expressing its frustration with the continual requests for extension of time given the age of this case, granted the motion to extend discovery deadlines but denied Plaintiffs' motion for conditional class and collective certification without prejudice.  (Doc. 117.)  Finally, on June 11, 2019 and June 14, 2019, Plaintiffs filed a new motion to certify class and collective actions of servers, as well as a motion for class certification of housekeeper attendants.[1]  (Docs. 126, 135.)

Defendants also filed a motion for partial summary judgment on June 14, 2019, a brief in support thereof, a statement of facts, and corresponding exhibits. (Docs. 139, 140, 141, 142.)  On August 14, 2019, Plaintiffs timely filed a brief in opposition, answer to the statement of facts, and exhibits, and on August 28, 2019, Defendants filed a reply.  (Docs. 145, 146, 147, 163.)  On September 24, 2019,

---

[1] These motions are fully briefed and ripe for disposition but will be addressed in a separate opinion.

Plaintiffs requested that the court hear oral argument on the pending motions, which the court denied on September 30, 2020.  (Docs. 167, 176.)

This case was reassigned to the undersigned on November 15, 2019. Thereafter, the parties informally requested that the court stay any decision on the pending motions as the parties were engaged in settlement negotiations.  Because the parties have reported to the court that a settlement could not be reached at this time, the court now turns to the fully briefed and ripe motion for partial summary judgment.

## FACTUAL BACKGROUND[2]

### A. Management of the Resorts.

Cove Haven, Paradise Stream, and Pocono Palace (collectively, "the Resorts") offer all-inclusive stays, where guests receive lodging, meals, and access to amenities, activities, and entertainment for a package charge.  (Doc. 141, ¶ 1.) This all-inclusive package is designed so that "guests need not concern themselves with continually paying for services – like food, amenities, and entertainment – as separate items during their stay."  (*Id.* ¶ 2.)  In 1995, the Resorts were purchased by ITT from Caesar's World, which had owned and managed the Resorts since at least 1979.  (*Id.* ¶ 3.)  In 1998, Starwood Hotels & Resorts Worldwide, Inc.

---

[2] In considering the instant motion for partial summary judgment, the court relied on the uncontested facts, or where the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to the nonmoving party.

("Starwood") purchased and began managing the Resorts.  (*Id.* ¶ 4.)  During its ownership and management, Starwood set charges and fees for the all-inclusive package that accompanied a room reservation at the Resorts.  (*Id.* ¶ 5.)  Starwood continued Caesar's World's practice of including a charge identified as "gratuity" ("the gratuity") as a component of the cost of the all-inclusive package.[3]  (*Id.* ¶ 5; Doc. 146, ¶ 5.)

In October 2012, Rockpoint and Highgate purchased the Resorts from Starwood and Highgate began managing the Resorts.  (Doc. 141, ¶ 10.)  Thus, Highgate succeeded Starwood as the employer of the Resorts' employees.  (*Id.* ¶ 11.)  Management of the Resorts marked a departure from Highgate's "historical practice of managing standalone hotels."  (*Id.* ¶ 12.)  Regardless of the reasons, Highgate continued the policies and practices for charges and fees for the all-inclusive packages at the resorts, including the gratuity as part of the total package cost.  (*Id.* ¶¶ 13–14; Doc. 143, ¶¶ 13–14.)  The all-inclusive package cost at the Resorts consisted of the room rate, the gratuity,[4] a resort fee,[5] and applicable taxes.

---

[3] Defendants aver that the gratuity is "mandatory."  From a review of the record, the gratuity appears to be "mandatory" in the sense that it is automatically included in the costs and fees charged to guests as a default.  (Doc. 142-6, p. 3.)  However, the gratuity could be removed from a guest's bill if requested, which demonstrates that it is negotiable rather than "mandatory."  (Doc. 145-1, p. 7; Doc.145-2, p. 9.)

[4] Highgate changed the gratuity from 18% to 20% at some point in time.  (*See* Doc. 145-4, p. 9; Doc. 146, ¶ 42.)

[5] Highgate began charging a resort fee around 2014 or 2015.  (Doc. 146, ¶ 35.)

(Doc. 141, ¶ 6; Doc. 146, ¶ 6.)  Sales tax was not collected on the gratuity charged to guests of the Resorts.  (Doc. 146, ¶ 49.)

Beginning around 2012, the Resorts and Groupon, Inc. ("Groupon") executed "Room Reservation Deal Requests," wherein Groupon agreed to "provide marketing, promotional, and room reservation services" for the Resorts.  (Docs. 142-17, 142-18, 142-19.)  One of the agreements with Groupon details certain applicable policies within the "Fine Print" for an all-inclusive stay and states that there is an 18% gratuity.  (Doc. 142-17, p. 3.)  Another agreement is for "room only" reservations and remains silent as to the gratuity.  (Doc. 142-18, p. 3.)  The last agreement has a "room only" or all-inclusive option, and details in the "Fine Print" that the "All-inclusive options have an additional 18% service fee added at purchase."  (Doc. 142-19, pp. 2–3.)  A print-out of Groupon's website regarding one of the Resorts purportedly from October 2012 provides for an "18% gratuity and 7.75% tax due at purchase" within "The Fine Print."  (Doc. 145-6, p. 2.)

Similarly, the "Terms and Conditions" on the Resorts' website provides that a 20% gratuity is "applied to all reservations."  (Doc. 145-10.)  Confirming this, an email dated July 12, 2015 confirming Nicholas Padula's ("Padula") reservation at the Resorts for July 14 to 15, 2015, provides a 20% gratuity of $41.85 for his stay.  (Doc. 145-11, pp. 2–3.)  Padula's invoice shows that the actual gratuity paid for his July 14 to 15, 2015 stay was $41.77.  (Doc. 145-12, p. 2.)

The Packard Companies purchased the Resorts in December 2015, and Highgate ceased ownership and management of the Resorts at that time. (Doc. 141, ¶ 33.)  During Highgate's ownership and management, it ensured that that its employees were paid at least the state and federal minimum wage of $7.25 per hour.  (Doc. 141, ¶ 34.)

The definition of the gratuity that was charged to guests as part of the all-inclusive package and the nature of the communication to guests regarding the gratuity are critical facts in this case.  With respect to these critical facts, the parties agree that the gratuity was allocated internally as revenue and was never distributed to the Resort employees as a gratuity.  (Doc. 141, ¶ 7; Doc. 146, ¶ 7.) However, the parties disagree regarding nearly all other aspects of the gratuity and there is conflicting testimony and documentation regarding the definition of and communication regarding the gratuity, as detailed in the next section.

**B. A summary of the conflicting evidence regarding the gratuity.**

In order to fully understand the claims and arguments in this case, the court finds it helpful to highlight some of the conflicting evidence provided to the court regarding the gratuity.

Maura Roman ("Roman"), the director of marketing and sales at the Resorts, testified that the gratuity was never intended to be paid to staff, waiters, or waitresses.  (Doc. 142-1, pp. 6–7.)  She further testified that when the Resorts were

owned by Starwood, the employees would tell guests that tips were included in their stay.  (Doc. 145-16, p. 6.)  She doesn't recall whether Highgate specifically told guests that tips were included, but Highgate continued the practices that Starwood had in place.  (*Id.* at 6–8.)

Judy Starner, the Resorts' director of finance, testified that the gratuity, which she viewed as the same thing as a service charge, was part of the revenue and was utilized to make payroll or pay for anything needed at the Resorts.  (Doc. 142-7, pp. 3–4, 6, 8–9.)  Donald Sheneman ("Sheneman"), the area director of operations at the Resorts, testified that "[t]he gratuity did not go to directly to hourly staff in the restaurant and rooms.  The [pay] formula had been put together based upon number of rooms cleaned and number of people served."  (Doc. 145-4, p. 8.)  Peter Doggett, who worked in a variety of roles at the Resorts from 1996 through 2014, understood the gratuity to "basically provide funding or additional revenues for payroll for all employees."  (Doc. 142-5, pp. 3–5, 7; Doc. 145-8, p. 3.)

Camber Coco ("Coco"), who was a front desk supervisor and, later, a guest services manager, testified that her understanding of the gratuity, and how she explained it to guests, was:

> [W]e were always told it covered housekeeping staff and dining room staff.  So, it covers your gratuity for your housekeeping, maid services. It also would cover your dining room staff, you know, for the meals served. . . . We would put the stipulation in there that alcohol is not included in the package; therefore, the cocktail servers, bartenders were not covered under the gratuity fee.

(Doc. 145-1, p. 6; Doc. 146, ¶ 37.)  Sheneman testified that he believed Coco's description of the gratuity was correct.  (Doc. 145-4, p. 6.)  Coco agreed that the guests understood that they would not have to "tip" while on the resort because of the gratuity fee.  (Doc. 145-1, p. 6.)  She never provided an explanation of the term "gratuity" because she assumed "it was common sense" to guests but explained that the gratuity covered the dining room staff and housekeeping.  (Doc. 145-1, p. 9.)  However, Coco also testified that guests did not ask whether the gratuity was "specifically" paid to wait staff or housekeeping, no one trained her as to the specifics of how the gratuity was accounted for, and she was never provided a written document giving her information for how the gratuity was accounted for or distributed, if it ever was distributed.  (Doc. 142-8, p. 3.)  Coco's understanding of how to describe the gratuity to guests was based upon oral training, and recalled that the training was "passed down between the supervisors."  (*Id.* at 4–5; Doc. 145-1, p. 5.)

Gary Rauschmeier ("Rauschmeier"), another front desk supervisor, testified that when people would ask "are tips covered," employees would say "well, you pay a gratuity fee."  (Doc. 145, ¶ 38; Doc. 145-2, p. 5.)  Although he did not specifically know which departments the gratuity covered, Rauschmeier assumed it went to "the housekeeping and wait staff in the restaurant."  (*Id.* at 6.)  He further testified that if the wait staff and housekeeping did not receive a portion of the

gratuity fee, he believed it would be misleading to the guests.  (*Id.* at 8.)  However, he does not recall anyone from Highgate specifically training him that the gratuity was utilized as tip money for wait staff or housekeeping.  (Doc. 142-10, p. 4.)  As stated previously, the gratuity fee could be removed from a bill by a manager if requested by a guest, but Rauschmeier only recalls this occurring three or four times.  (Doc. 145-1, p. 7; Doc. 145-2, p. 9.)

Elizabeth Mosher, who worked at the Resorts since 2006 as a front desk agent and concierge, recalls that guests did not ask about the gratuity often.  (Doc. 145-17, p. 6.)  If guests asked what the tip or gratuity amount was for, Mosher would tell guests it was for wait staff and housekeeping service.  (Doc. 145-17, p.7.)

Conversely, James McGrath ("McGrath"), who was hired to be the regional vice-president of operations for the Resorts, testified that he had not previously heard that the gratuity was to cover tips for wait staff and housekeepers.  (Doc. 142-2, p. 4; Doc. 145-7, p. 3.)  Rather, "[t]he gratuity went to general revenues and went to cover payroll and maintenance and amenities and other things.  Anything – any expenses that the property had."  (Doc. 145-7, p. 3.)  If a guest was told that wait staff was receiving part of the gratuity, McGrath stated that "might confuse the guest" and that the employee "didn't necessarily know what they were talking about."  (Doc. 145-7, p. 4; Doc. 142-2, p. 6.)  McGrath viewed the gratuity

collected "as a service charge." (Docs. 142-2, p. 5.) Similarly, Julia Perry, a reservations manager, testified that if a guest asked about the gratuity fee, she would tell them it was "part of their package price. It didn't go to anybody. It wasn't given to any specific person." (Doc. 142-15, p. 5.)

As to documentary evidence, a document titled "Resort Fee FAQs for Team Members,"[6] provides that the 18% gratuity "covers the incredible service from our servers and attendants that you receive during your visit with us." (Doc. 145-3, p. 2.) Furthermore, the Resorts "Contact Center Agent Training Guide" provides that: "A Gratuity charge of 20% is charged in our rates and goes towards traditionally tipped associates such as meals servers and housekeepers. This gratuity charge does not go to bartenders or cocktail servers as alcohol is not included [sic] our packages." (Doc. 145-5, p. 22.)

### JURISDICTION

Because this case raises a question under federal law through the FLSA, the court has original jurisdiction over this case under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Further, venue is appropriate under 28 U.S.C. § 1391.

---

[6] This document was created by Roman as an agent of Defendants. (Doc. 145, ¶ 4.) Roman was the director of marketing and sales at the Resorts.

### STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "'A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case.'" *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks and citation omitted); *see also* Fed. R. Civ. P. 56(c)(4) (establishing requirements for affidavits or declarations filed in support of or opposition to a motion for summary judgment). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)). Critically, the court is not required to go on a fishing expedition in search of relevant evidence. The court is only required to consider the evidence that the parties cite in their summary-judgment filings. Fed. R. Civ. P. 56(c)(3).

Summary judgment will generally be appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence

13

in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**DISCUSSION**

Defendants move for summary judgment on six of Plaintiffs' claims. The court will address each argument in turn.

## A. Defendants' are entitled to summary judgment on Plaintiffs' minimum wage claims.

In Counts 1 and 3 of the fourth amended complaint, Plaintiffs allege unpaid minimum wage claims under the FLSA and MWA. (*See* Doc. 110, ¶¶ 61–65, 72–76.) Defendants argue that judgment should be entered in their favor because Plaintiffs cannot present any evidence that employees received less than $7.25 per hour. (Doc. 140, p. 15.) Indeed, in their response to Defendants' statement of undisputed material facts, Plaintiffs admit that Highgate ensured its employees received at least $7.25 per hour, the applicable state and federal minimum wage. (Doc. 141, ¶ 34; Doc. 146, ¶ 34.) Further, Plaintiffs do not set forth any argument in their opposition brief to contradict Defendants' argument, and do not address their FLSA and MWA minimum wage claims at all. (*See* Doc. 147.) Thus, not only have Plaintiffs conceded the critical fact necessary to support these claims,

Plaintiffs have also abandoned these claims. *See Bowser v. Bogdanovic*, No. 08-cv-847, 2010 WL 1462548, at *5 n.9 (M.D. Pa. Apr. 9, 2010) ("when the moving party argues that summary judgment should be granted in its favor regarding a certain claim, the non-movant abandons that claim by failing to address it in his response to the motion for summary judgment") (citing *Seals v. City of Lancaster*, 553 F. Supp. 2d 427, 432–33 (E.D. Pa. 2008); *Hackett v. Cmty. Behavioral Health*, No. 03-6254, 2005 WL 1084621 (E.D. Pa. 2005)). Accordingly, summary judgment will be granted in Defendants' favor on Counts 1 and 3.

## B. Defendants are entitled to summary judgment on Plaintiffs' breach of contract to an express third-party beneficiary claim and on Plaintiffs' breach of contract to an intended third-party beneficiary claim.

In Count 5 of the fourth amended complaint, Plaintiffs assert a claim for breach of contract to an express third-party beneficiary. (Doc. 110, ¶¶ 83–89.) Similarly, in Count 6, Plaintiffs assert a claim for breach of contract to an intended third-party beneficiary. (*Id.* ¶¶ 90–97.) Both of these claims sound in Pennsylvania contract law. Defendants argue that they are entitled to summary judgment on both claims. (Doc. 140, pp. 16–20.)

Pennsylvania has adopted the Restatement (Second) of Contracts § 302 (1981) for determining third-party beneficiary status. *Scarpitti v. Weborg*, 609 A.2d 147, 149 (Pa. 1992); *see also Sovereign Bank v. BJ's Wholesale Club, Inc.*,

395 F. Supp. 2d 183, 198–199 (M.D. Pa. 2005).  The Pennsylvania Supreme Court

helpfully summarized the third-party beneficiary law in *Scarpitti v. Weborg*:

> [A] party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, *unless*, the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of the promise to pay money to the beneficiary or the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance.

609 A.2d at 150–151 (citations omitted) (emphasis in original).  Thus, there are

two tests for third-party beneficiary status in Pennsylvania.  *Sovereign Bank*, 395

F. Supp. 2d at 199.  These two tests are discussed in the following sections as each

test relates to Plaintiffs' third-party beneficiary claims.

### 1.  Plaintiffs were not express third-party beneficiaries to the contracts between Defendants and their guests.

The first test, which deals with an express third-party beneficiary, requires

"that the party to the agreement indicate in the agreement itself that the purported

beneficiary is a third-party beneficiary."  *Sovereign Bank*, 395 F. Supp. 2d at 199.

Defendants argue that judgment should be entered in their favor on the breach of

contract to an express third-party beneficiary claim because Plaintiffs cannot show

that they, or any employees, were affirmatively named or identified as third-party

beneficiaries in any provision of Defendants' contracts with their guests.  (Doc.

140, p. 16.)  Conversely, Plaintiffs argue that a reasonable jury could conclude that

they were "express third-party beneficiaries because of the common sense understanding of the term gratuity." (Doc. 147, p. 14.) Citing cases applying Ohio, New Jersey, and California law rather than Pennsylvania law, Plaintiffs' submit that the third-party beneficiary need not be named in the contract expressly as long as that third party was contemplated by the parties and sufficiently identified in the contract. (*Id.* at 14–15.)

It should be noted that neither party clearly identifies "the contract" between the Resorts and their guests, but this issue is not argued by either party as a basis to grant or deny summary judgment on the breach of contract claims. However, Defendants provide three exhibits titled "Room Reservation Deal Request" that were executed between the Resorts and Groupon at different times. (Docs. 142-17, 142-18, 142-19.) Plaintiffs, on the other hand, offer the "Terms and Conditions" that appeared on the Resorts' website in 2015, an email confirmation of a reservation from the Resorts to Nicholas Padula on July 12, 2015, and an invoice from the Resorts to Padula dated July 15, 2015. (Docs. 145-10, 145-11, 145-12.) Since the parties have submitted these documents as the operative "contracts" between Defendants and their guests, the court has reviewed each of them.

Based on the court's review of the documents submitted by the parties, the court finds that there is no statement in any of the documents between the Resorts and their guests indicating that the employees are an express third-party

17

beneficiary to the agreement between the Resorts and the guests. The law in Pennsylvania on express third-party beneficiaries is clear – the agreement must identify the intended beneficiary. Regardless of a common sense understanding of the term gratuity, the documents that have been submitted to the court in this matter do not identify the employees as beneficiaries to the agreement. Accordingly, summary judgment will be granted in favor of Defendants on Count 5.

### 2. Plaintiffs were not intended third-party beneficiaries to the contracts between Defendants and their guests.

The second test for a third-party beneficiary does not require an express recognition in the contract itself. *Sovereign Bank*, 395 F. Supp. 2d at 199. However, it requires that: (1) the circumstances "be so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties;" and (2) that "the performance satisfies an obligation of the promise to pay money to the beneficiary," or that "the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance." *Id.* The Pennsylvania Supreme Court further elaborated on this intended third-party beneficiary test, stating:

> The first part of the test sets forth a standing requirement which leaves discretion with the court to determine whether recognition of third party beneficiary status would be appropriate. The second part defines the two types of claimants who may be intended as third party

beneficiaries.  If a party satisfies both parts of the test, a claim may be asserted under the contract.

*Scarpitti*, 609 A.2d at 150 (citing *Guy v. Liederbach*, 459 A.2d 744, 751 (Pa. 1983)).

Defendants argue that their contracts with guests do not present a circumstance that compels recognition of the employees as intended third-party beneficiaries.  (Doc. 140, p. 18.)  The purpose of the contracts was for the guests to provide payment to Defendants in exchange for an all-inclusive resort package. (*Id.*)  According to Defendants, these contracts, including the information regarding gratuity, do not demonstrate any intention by Defendants or their guests to benefit Plaintiffs and there are no other circumstances indicating that intent. (*Id.*)

Next, Defendants argue that it is inconsequential that some front desk employees "mistakenly believed that the Gratuity was distributed directly to certain service employees as tips, and told guests the same."  (*Id.* at 19.)  In Defendants' view, the evidence is clear that Defendants never actually intended to distribute the gratuity as tips to Plaintiffs.  (*Id.*)  In an effort to support this argument, Defendants seem to argue that the parol evidence rule bars the conflicting evidence regarding the gratuity from modifying the express language in the contracts with Defendants' guests.  (*Id.*)  Lastly, Defendants aver that Plaintiffs cannot satisfy the second element of the intended third-party beneficiary test

because there is nothing in their contracts with guests that establishes an obligation to distribute the gratuity to Plaintiffs, nor is there any legal basis for such an obligation.  (*Id.* at 20.)

Plaintiffs argue that a reasonable jury could find that Plaintiffs were the intended third-party beneficiaries of the contract between Defendants and their guests.  (Doc. 147, p. 16.)  In sum, Plaintiffs aver that the "distribution of the gratuity to the traditionally tipped employees effectuates the intentions of the parties at the time of the contract and Plaintiffs were part of the limited class of person[s] intended to benefit from the contract."  (*Id.*)

Plaintiffs seem to generally assert that each agreement between Defendants and their guests to provide an all-inclusive stay in return for payment constitutes "the contract."  (*See* Doc. 147, p. 16–17.)  They propose that "the purpose of the contract was to provide a room and traditionally tipped services to the guests of Defendants."  (*Id.* at 16.)  Plaintiffs argue that this shows "the contemplation and intentions of the promisor – Defendants – and promisees – the guests – at the time of entering into the contracts," which satisfies the standing requirement of the intended third-party beneficiary claim.  (*Id.*)  Furthermore, Plaintiffs submit the second part of the test is satisfied because "it is clear that the traditionally tipped employees were the limited class of persons intended to benefit from the contract between Defendants and their guests."  (*Id.* at 17.)  Considering all of this,

Plaintiffs aver that there is at least a genuine issue of material fact regarding whether they were the intended third-party beneficiaries of the contract. (*Id.*)

Whether Plaintiffs were intended third-party beneficiaries to the gratuity provision included in the contract between Defendants and their guests hinges on the intentions of the parties to the contract. The law requires that the court look to the intention of the parties to the contract to determine whether the potential third-party beneficiary has standing. *Sovereign Bank*, 395 F. Supp. 2d at 199. While the parties agree, as a matter of fact, that the gratuity collected from guests was allocated internally as revenue and was never distributed to the Resort employees as a gratuity, they dispute Defendants' and the guests' intentions regarding the gratuity. The record evidence reveals that Defendants' upper level management's intent was always to collect the gratuity as a portion of the Resorts revenue. (*See supra* section B.) Although lower-level management, front desk staff, and general employees had conflicting understandings of the purpose of collecting gratuity from guests, that does not reflect the intention of Defendants, which the parties agree was to collect the gratuity as revenue. (*See id.*)

The intentions of the guests who contracted with Defendants for an all-inclusive package is less clear and cannot be ascertained from the record presented to the court. However, applying the summary judgment standard, once a movant provides evidence and argument that it believes demonstrate an absence of material

fact, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice." *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E.*, 765 F.3d at 268–69).  Here, Plaintiffs merely present conclusions and suspicions as to the guests' intentions regarding the gratuity.  They fail to provide any actual evidence that guests intended to enter the contract with Defendants for the purpose of an all-inclusive stay <u>and</u> providing the gratuity to traditionally tipped employees.  Rather, Plaintiffs provide evidence regarding the lower-level management and employees understanding of the gratuity, which does not sufficiently establish the guests' intent.  Plaintiffs have not presented evidence in support of the guests' intention with respect to the gratuity, which is a required element that Plaintiffs must prove in support of this claim, thus, the court must rule in favor of Defendants.  *See Celotex*, 477 U.S. at 322.  Accordingly, the court will grant Defendants' motion as to Count 6 of the fourth amended complaint.

## C. Defendants are not entitled to summary judgment on Plaintiffs' unjust enrichment claim.

In Count 7 of the fourth amended complaint, Plaintiffs set forth a claim for unjust enrichment.  Unjust enrichment is an equitable action that sounds in quasi-contract, i.e. a contract implied in law.  *Sevast v. Kakouras*, 915 A.2d 1147, 1153 n.7 (Pa. 2007).  In Pennsylvania, a plaintiff must prove that: "(1) benefits have been conferred on one party by another; (2) the recipient has appreciated the

benefits; and (3) the recipient has accepted and retained the benefits under such circumstances that it would be inequitable or unjust for the recipient to retain the benefits without payment of value." *Thompson v. U.S. Airways, Inc.*, 717 F. Supp. 2d 468, 480 (E.D. Pa. 2010) (citing *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir.2000) (applying Pennsylvania law)). Stated another way, a plaintiff must show that "the party against whom recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.'" *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. 1985).

Defendants argue that Plaintiffs' unjust enrichment claim fails for several reasons. First, Plaintiffs did not provide any benefit to Defendants for which Defendants were unjustly enriched because the gratuity, the benefit upon which Plaintiffs base their claims, was conferred upon Defendants by their guests, not Plaintiffs. (Doc. 140, p. 21.) This gratuity, along with the other fees, was paid to Defendants for the all-inclusive package; thus, Plaintiffs were not the provider of the benefit at issue. (*Id.* at 21–22.) Next, Defendants argue that Plaintiffs cannot establish that it would be unjust for Defendants "to retain the benefits of Plaintiffs' services without further compensation" because they never agreed to pay Plaintiffs the gratuity. (*Id.* at 22.) According to Defendants, Plaintiffs' performance of their

job duties for their agreed-upon compensation cannot give rise to an unjust

enrichment claim.  (*Id.*)

Plaintiffs argue that Defendants were unjustly enriched by Defendants

"stepp[ing] into the shoes" of Plaintiffs to obtain gratuities from the Resorts'

guests.  Plaintiffs assert that gratuity would ordinarily be paid by guests to

Plaintiffs directly, and it was represented to guests that the gratuity would be paid

to Plaintiffs.  (Doc. 147, pp. 21–22.)  Thus, Defendants received the gratuity that

would "typically be received by the traditionally tipped employee," i.e. Plaintiffs, a

benefit that Defendants would not have otherwise obtained.  (*Id.* at 22.)  Plaintiffs

further argue the gratuity was paid through the use of deception, and that "[b]ut for

Defendants' scheme, Plaintiffs would have received additional monies in the form

of gratuities from Defendants' guests as Plaintiffs were performing traditionally

tipped work."  (*Id.*)

Defendants fail to cite any pertinent caselaw in support of their argument

that Plaintiffs' unjust enrichment claim cannot proceed because it was the third-

party guests who provided the benefit (the gratuity payment) to Defendants.  The

sole decision cited by Defendants on this point held simply that plaintiffs, who

were employees of defendants, could not sustain an unjust enrichment claim for

bringing their "business acumen" to defendants when they were compensated for

their work.  (*See* Doc. 140, pp. 21–22 (citing *Bair v. Purcell*, 500 F. Supp. 2d 468,

495 (M.D. Pa. 2007).)  However, this case does not stand for the legal proposition argued by Defendants here.  Conversely, in a factually similar case to the instant matter, another Pennsylvania district court permitted the plaintiffs' unjust enrichment claim to proceed even though the benefit was conferred upon the defendants by a third party rather than plaintiffs.  *See Thompson*, 717 F. Supp. 2d at 480–481 (holding that "it would be unjust for Defendants to pay skycaps as tipped employees while at the same time employing a fee collection system which misleads passengers into believing they are tipping skycaps when they are actually paying an airline fee").[7]

In addition, although Defendants argue that Plaintiffs did not provide any benefit for which Defendants were unjustly enriched, the court concludes – as a matter of common sense – that Defendants could not have collected a gratuity fee absent the services provided by Plaintiffs.  In other words, if Plaintiffs did not provide any housekeeping or dining services, it stands to reason that guests would not agree to pay a gratuity as part of their all-inclusive package fee.  By performing their jobs as wait staff and housekeepers, Plaintiffs gave Defendants a reason to

---

[7] The court acknowledges that there are important differences between *Thompson* and this case, but finds that *Thompson* provides support for that proposition that Pennsylvania law allows an unjust enrichment claim when a third party, rather than a plaintiff, pays the monetary benefit that is alleged to have unjustly enriched the defendant.

collect the gratuity, regardless of Defendants' intended use of the gratuity as revenue.

It is clear from the record that Defendants received a benefit through the payment of the gratuity by their guests, and it is also clear that Defendants have "appreciated" that benefit in the form of an additional revenue stream for the Resorts.  It is the third element of the unjust enrichment test that involves disputed material facts – whether Defendants accepted and retained the gratuities only because their guests, in paying the gratuity, believed the gratuity would be passed on to traditionally-tipped employees like Plaintiffs.  If a jury so concludes, then a jury could also reasonably conclude that Defendants accepted and retained the benefit of the gratuity payment under such circumstances that it would be inequitable or unjust for Defendants to retain the benefits without payment of value to Plaintiffs.  Thus, for these reasons, the court will deny summary judgment as to Count 7.

### D. Defendants are entitled to summary judgment on Plaintiffs' conversion claim.

Finally, in Count 8 of the fourth amended complaint, Plaintiffs set forth a claim for conversion.  Under Pennsylvania law, conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Kia v. Imaging Scis. Int'l, Inc.*, 735 F. Supp. 2d 256, 270 (E.D. Pa. 2010) (quoting *Francis J. Bernhardt, III, P.C.*

*v. Needleman*, 705 A.2d 875, 878 (Pa. Super. Ct. 1997); *see also Universal*

*Premium Acceptance Corp. v. York Bank & Tr. Co.*, 69 F.3d 695, 704 (3d Cir.

1995).  "Money may be the subject of a conversion" but only if "the plaintiff had a

property interest in the money at the time of the alleged conversion."  *Kia*, 735 F.

Supp. 2d at 270 (citing *Montgomery v. Fed. Ins. Co.*, 836 F. Supp. 292, 300 (E.D.

Pa. 1993); *Shonberger v. Oswell*, 530 A.2d 112, 114–15 (Pa. 1987)) (additional

citations omitted).

Defendants argue that Plaintiffs' conversation claim fails because Plaintiffs

never had a property interest in the gratuity, i.e. Plaintiffs never owned or

possessed the gratuity that was paid by the guests to Defendants.  (Doc. 140,

p. 23.)  In contrast, Plaintiffs argue that they had "a possessory right to the

gratuities because Defendants' guests intended for traditionally tipped employees,

including Plaintiffs, to receive such gratuities."  (Doc. 147, p. 23.)

In this instance, Plaintiffs take the issue of the guests' intentions too far.

Regardless of the factual disputes surrounding the guests' intentions in paying the

gratuity, Plaintiffs never possessed, owned, or had a property interest in the

gratuity at the time it was paid to Defendants.  *See Kia*, 735 F. Supp. 2d at 270

(holding that defendants did not deprive plaintiff of his share of proceeds from the

sale of a business because those monies were paid to defendants in exchange for

voting shares, and plaintiff never owned or otherwise had an ownership interest in

the business).  Plaintiffs' conversion claim for the gratuity paid by guests is most akin to an unpaid debt by Defendants, which is not a proper conversion claim under Pennsylvania law.  *See id.* (citing *Needleman*, 705 A.2d at 878).  While Plaintiffs may have a valid claim to the gratuity payments through their unjust enrichment claim, Plaintiffs had no possessory right to those monies at the time the guests paid Defendants.  Thus, the court will grant summary judgment in favor of Defendants on Count 8.

## CONCLUSION

For the reasons stated herein, the court will grant Defendants' motion for summary judgment as to Counts 1, 3, 5, 6, and 8, but deny the motion as to Count 7.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: November 25, 2020